**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DANIEL AZIZ AL KHAL,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO.   22-cv-1662** |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                                      **7/13/2023**

Plaintiff brought this action seeking review of the Acting Commissioner of Social

Security Administration's decision denying his claim for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 401-34.  This matter is before me for

disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request for

Review (ECF No. 7) is **GRANTED**, and the matter is remanded for further proceedings

consistent with this memorandum.


## I.      PROCEDURAL HISTORY

Plaintiff protectively filed for DIB, alleging disability since February 1, 2019, due to a

fused left ankle, fused left toes, fasciotomy of the lower left leg with loss of muscle and

ligaments, nerve damage of the lower left leg and foot, depression, anxiety, PTSD, and chronic

pain from surgeries of the left leg and foot.  (R. 162-65, 190).  Plaintiff's application was denied

at the initial level and upon reconsideration, and Plaintiff requested a hearing before an

Administrative Law Judge (ALJ).  (R. 58-69, 61-87, 101-01).  Plaintiff, represented by counsel,

and a vocational expert testified at the March 31, 2021 administrative hearing.  (R. 32-57).  On

May 5, 2021, the ALJ issued a decision unfavorable to Plaintiff.  (R. 15-31).  Plaintiff appealed

the ALJ's decision, but the Appeals Council denied Plaintiff's request for review on March 8,

2022, thus making the ALJ's decision the final decision of the Commissioner for purposes of

judicial review.  (R. 1-6).

On April 29, 2022, Plaintiff filed a complaint in the United States District Court for the

Eastern District of Pennsylvania and consented to my jurisdiction pursuant to 28 U.S.C. § 636(C)

on June 3, 2022. (Compl., ECF No. 1; Consent Order, ECF No. 5).  On July 24, 2022, Plaintiff

filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 7).

The Commissioner filed a response on September 20, 2022, and on September 30, 2022, Plaintiff

filed a reply brief.  (Def.'s Br., ECF No. 10; Pl.'s Reply Br., ECF No. 11).

## II.    FACTUAL BACKGROUND[1]

The Court has considered the administrative record in its entirety and summarizes here

the evidence relevant to the instant request for review.

Plaintiff was born on December 9, 1981, and was thirty-seven years old on the alleged

disability onset date.  (R. 162).  He had at least a high school education and previously worked as

a bartender, a line operator, and a manufacturing supervisor.  (*Id.*).

### A.    Medical Evidence

Plaintiff was born with a left clubfoot deformity, and he had surgery on his left foot at

birth.  (R. 293, 335).  In 2003, he underwent left calf implantation surgery, which resulted in

complications requiring the removal of the implant.  (*Id.*).  After the implant's removal, Plaintiff

---

[1]  The Plaintiff's Request for Review focuses on the ALJ's consideration of his treating physician's opinion concerning limitations arising out of problems with his left lower extremity. (Pl.'s Br., ECF No. 7, at 4-12).  Accordingly, the Court does not recite the evidence regarding his other conditions, except where otherwise relevant to his challenge to the ALJ's decision.

had a large defect on the medial lateral side of his left calf.  (*Id.*).  In 2013, fusion of Plaintiff's

left ankle and toes was performed by podiatrist Michael S. Downey, M.D.  (R. 335, 373).  In

June 2015, reconstructive surgery, which included graft excision, tissue rearrangement, and

additional grafting, was performed on his left calf.  (R. 283-84)  Plaintiff had fat grafted on his

left lower extremity in September 2017, December 2017, and December 2018.  (R. 301-02, 314-

15, 374, 380).

On August 10, 2020, Ziba Monfared, M.D., conducted an internal medicine consultative

examination of Plaintiff.  (R. 335-39).  Dr. Monfared's report noted that Plaintiff had a left ankle

brace and did not use a hand-held assistive device.  (R. 335, 337).  Plaintiff reported that he

experienced pain, which he rated at a five out of ten on a daily basis and at a ten out of ten on

aggravation.  (R. 335).  Dr. Monfared observed that the left leg was about half an inch shorter

than the right leg.  (*Id.*).  Plaintiff did not appear to be in acute distress, he was able to change for

the examination and get on and off the examination table without assistance, and he had no

difficulty rising out of his chair.  (R. 336-37).  But his gait was abnormal with a slight limp

favoring the right side.  (R. 336).  The limp was less obvious when he wore his brace.  (R. 336-

37).  Plaintiff was unable to walk on his heels and toes due to weakness on the left side, and he

was able to squat to only fifty percent of normal due to left lower extremity weakness.  (R. 337).

His stance was abnormal because of the length discrepancy between his legs.  (*Id.*).  There was

extensive scarring in the left calf area with significant atrophy and muscle loss together with

reduced circumference of the calf on the left.  (R. 337-38).  Plaintiff's joints were stable, but

limited movement on the left ankle was noted.  (R. 337).  Sensation was diminished in Plaintiff's

lower left leg due to extensive scarring and surgery, and Dr. Monfared rated left leg strength at

four out of five, with the strength of his upper extremities and right extremity rated at five out of

five.  (R. 338).  Dr. Monfared diagnosed a history of congenital club foot on the left following

numerous surgeries with fusion of ankle and toes, gait and balance difficulties, and atrophy of the left lower extremity.  (*Id.*).  She concluded that Plaintiff's prognosis was fair.  (*Id.*).

Dr. Monfared opined that given his gait and balance difficulties, Plaintiff could occasionally lift and carry up to twenty pounds; at one time without interruption, could sit for eight hours, stand for one hour, and walk for thirty minutes; in an eight-hour workday, could sit for eight hours, stand for four hours, and walk for eight hours; could occasionally use foot controls; could occasionally climb stairs and ramps, stoop, kneel, and crawl; could not climb ladders, balance, or crouch; could tolerate occasional exposure to extreme cold and vibrations, frequent exposure to moving mechanical parts; could not be exposed to unprotected heights; and could not walk a block at a reasonable pace on rough or uneven surfaces.  (R. 340-44). According to the internal medicine consultant, Plaintiff did not require the use of a cane to ambulate.  (R. 342).

On December 21, 2020, Plaintiff presented to his primary care physician, Wael Yacoub, M.D., with complaints of chronic left foot and upper leg pain.  (R. 353).  Plaintiff rated the pain at a four out of ten and described it as constant, aching, cramping, shooting, and stabbing.  (*Id.*). Tenderness was found in his left knee and ankle and his left ankle had a decreased range of motion.  (R. 354).  The other physical examination findings were unremarkable.  (R. 353-54). Dr. Yacoub diagnosed left foot pain.  (R. 353-54).

On February 17, 2021, Dr. Yacoub completed a "Medical Opinion RE: Ability to Do Work-Related Activities (Physical)" form, concluding that Plaintiff cannot perform any gainful employment on a continuous and sustained basis.  (R. 368-75).  Based on his findings of ongoing treatment for surgical complications of the lower left extremities, he opined that Plaintiff could lift and carry less than ten pounds on an occasional or a frequent basis; during an eight-hour day, could stand and walk less than two hours and sit less than two hours; could sit for ten minutes

4

and stand for five minutes before changing position; must walk around every thirty minutes for five minutes; must have the opportunity to shift at will from sitting or standing/walking; and will sometimes need to lie down at unpredictable intervals on an hourly basis or dependent on his level of pain.  (R. 369).  He further opined that Plaintiff could occasionally twist, stoop, and climb stairs and could never crouch or climb ladders.  (*Id.*).  According to Dr. Yacoub, Plaintiff could not reach, handle, or push/pull because he was unable to stand while performing such physical functions due to the severe damage to the lower extremity.  (R. 370).  He could finger and feel with his upper extremities.  (*Id.*).  The primary care physician also stated that Plaintiff must avoid all exposure to extreme cold, extreme heat, and hazards together with concentrated exposure to wetness, humidity, and fumes due to his limited mobility and because the environmental conditions could cause swelling and pain in the lower left extremity.  (*Id.*).  He explained that Plaintiff must use a leg brace and therefore could not kneel, crawl, or balance properly and must elevate his leg frequently due to an ongoing chronic condition.  (*Id.*).  Dr. Yacoub anticipated that Plaintiff would be absent from work more than three times a month.  (R. 371).  The physician concluded his conditions or medications were likely to cause a degree of pain and fatigue or drowsiness which would significantly interfere with Plaintiff's gainful employment on a continuous and sustained basis.  (R. 372).  He concluded his opinion with the following description of Plaintiff's conditions and diagnoses:  decreased strength, decreased range of motion, pain, gait deviations and balance deficits; ADL dysfunction, impaired functional mobility; limited activity tolerance; and depression and anxiety due to pain.  (R. 372).

Plaintiff was examined by Dr. Downey on February 25, 2021.  (R. 379).  He presented with a foot problem and asked for his ankle and toes to be checked because of his past surgeries.  (*Id.*).  Plaintiff said that he did well after his fusion surgeries, but problems had worsened over the past two years, and he had increasing difficulty standing and walking on his left foot.  (*Id.*).

The podiatrist noted abnormal findings relating to Plaintiff's left foot and leg, including rigid hammertoes on the left and hallux malleus deformity (great toe hammertoe); loss of subcutaneous fat tissue and muscle, left lower leg with extensive scarring; loss of collapsing pes valgo planus deformity, bilaterally; decreased ankle joint dorsiflexion, left, and absent hindfoot and midfoot motion; antalgic gait and decreased ankle range of motion; and decrease of "sharp-dull" discrimination in the left leg.  (R. 381-82).  Dr. Downey diagnosed acquired hammer toe, hallux malleus, primary osteoarthritis, and pain in the left foot.  (R. 382).  He reviewed the clinical findings and both conservative and surgical treatment options with Plaintiff.  (*Id.*).  Plaintiff expressed interest in surgical intervention, but he continued to receive conservative treatment, with Plaintiff being provided with pads and toe separators and intending to try appropriate shoes and over-the-counter insoles.  (*Id.*).  X-ways of the left foot were ordered.  (*Id.*).

X-rays of Plaintiff's left foot were taken on March 3, 2021.  (R. 378).  He returned to Dr. Downey for a follow up appointment on March 4, 2021.  (R. 373).  Dr. Downey's treatment record indicated that Plaintiff had an ankle brace on his left leg.  (R. 377).  The podiatrist's physical examination findings were substantially the same as his earlier findings, except for an additional finding of decreased sharp-dull discrimination in both the left leg and foot.  (R. 375-76).  The X-rays substantially confirmed his findings.  (R. 376).  Dr. Downey made the same diagnoses he made in February 2021 and added a diagnosis of arthritis of the left ankle.  (*Id.*).  Dr. Downey again discussed the findings and both conservative and surgical treatment options with Plaintiff.  (*Id.*).  Plaintiff expressed interest in surgical intervention but intended to continue with conservative treatment "for now."  (R. 377).  Pads and separators were again dispensed, and it was noted that Plaintiff would try to find appropriate shoes and OTC insoles.  (*Id.*).

### B.     Non-Medical Evidence

The record also contains non-medical evidence.  In Adult Function Reports dated May 7, 2020 and November 23, 2020, Plaintiff stated that that he is unable to work because of the pain in his left foot, ankle, toes, and leg; does not have any movement in his toes and ankle, which are completely locked; has significant muscle and tendon loss in his left leg; cannot stand or sit for long periods of time; and must rest and elevate his leg for most of the day.  (R. 175, 207).  He lives with his wife and spends his days at home helping to take care of his daughter, resting, reading, watching television, sitting outside of the house, and eating meals.  (R. 175-76, 207-08).  He has no difficulties with personal care.  (R. 176, 208).  Plaintiff prepares simple meals for himself.  (R. 177, 209).  He also performs minor household repairs, mows the lawn using a tractor mower, and washes the dishes.  (R. 177. 209-10).  He can drive a car and shop in stores.  (R. 178, 210).  Plaintiff checked boxes on the form indicating difficulties with lifting, squatting, standing, sitting, walking, kneeling, stair climbing, memory, completing tasks, and concentration.  (R. 180, 212).  He stated that his foot starts to throb if not elevated frequently and that he could only lift ten pounds, could not bend his foot, and could not walk or kneel for too long.  (R. 212).  He could walk a block and needs to rest a few minutes before he could resume walking.  (R. 180, 212).  He checked the box indicating that he uses a brace/splint, explaining that a brace was prescribed in 2003 or 2004.  (R. 183, 213).  Plaintiff stated that his injury has severely affected who he is as a person, explaining that he has constant pain and severe disfigurement.  (R. 182).  He also indicated that he has fatigue because of his age, worsening pain, and inability to sleep.  (R. 183).  He believed that his almost constant pain, described as burning, throbbing, and stiffness, started because of "the bad surgery."  (R. 184).  He takes Vicodin for the pain, which provides him temporary relief.  (R. 185).

On June 7, 2020, a Third-Party Adult Function Report was completed by Jessica Al Khal,

Plaintiff's wife.  (R. 215-22).  She substantially concurred with Plaintiff's assessment of his

conditions, activities, and limitations.  (R. 215-22).

At the March 31, 2021 administrative hearing, Plaintiff testified that he lives with his

wife in their house with their daughter.  (R. 34).  He has a driver's license and can drive, but does

not drive long distances.  (R. 38, 46).  Plaintiff had ankle fusion surgery in 2013 and was laid off

from his last job because of downsizing in January 2016.  (R 38, 47).  After he lost his job, he

unsuccessfully looked for other work.  (R. 38).  Plaintiff also resumed treatment for his leg and

foot because the pain had returned and he had the time to go to the doctor.  (R. 38-39).  Plaintiff

testified to having two additional surgeries on his left foot in 2017 and 2018.  (R. 39, 301-02,

314-15, 374, 380).  According to Plaintiff, the injury has worsened with aging and the arthritis

has fused in his ankle, toes, and feet.  (*Id.*).  The surgery, which was supposed to help, had the

opposite effect, leaving him to wonder if he should have "just, like, left it alone."  (R. 39-40).

He recently saw his doctor who recommended another surgery.  (R. 40).  He could not stand for

longer than ten to fifteen minutes because of pain and the pressure being put on his lower

extremity.  (R. 40-42).  Sitting causes his left foot to swell and throb, and Plaintiff must rest and

elevate or ice the foot hourly to alleviate the pain and help with his circulation.  (R. 41, 49-51).

He has a limp and needs support to walk, and he can walk for five to ten minutes.  (*Id.*).  It takes

Plaintiff two to three hours to get ready in the morning.  (R. 52).

III.    **ALJ'S DECISION**

Following the administrative hearing, the ALJ issued a decision in which she made the

following findings:

1.    The claimant meets the insured status requirements of the Social Security Act

through December 31, 2021.

2.      The claimant has not engaged in substantial gainful activity since February 1, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.      The claimant has the following severe impairments: left club foot deformity and residual effects of multiple surgeries, bilateral pes planus and hallux malleus, left lower osteoarthritis, and obstructive sleep apnea (OSA) (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

[5.]    After careful consideration of the entire record, I find that claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except he is further limited to occasional kneeling, balancing, crawling, and climbing ramps and stairs; and no crouching or climbing ladders, ropes or scaffolds.  He cannot operate foot controls using the left lower extremity; can have no exposure to unprotected heights; and can tolerate occasional exposure to extreme heat, extreme cold, to vibration, wetness, and humidity.

[6.]    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

[7.]    The claimant was born on December 9, 1981 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

[8.]    The claimant has at least a high school education (20 CFR 404.1564).

[9.]    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

[10.] Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

[11.] The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2019, through the date of this decision. (20 CFR 404.1520(g)).

(R. 20-27). Accordingly, the ALJ found Plaintiff was not disabled. (R. 27).

## IV.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 1382c(a)(3)(A). A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work. If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The disability claimant bears the burden of establishing steps one through four.

If the claimant is determined to be unable to resume previous employment, the burden shifts to

the Commissioner at step five to establish that, given the claimant's age, education, work

experience, and mental and physical limitations, he is able to perform substantial gainful

activities in jobs existing in the national economy. *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88,

92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited.  A district court is

bound by the factual findings of the Commissioner if they are supported by substantial evidence

and decided according to correct legal standards. *See, e.g.*, *Hartranft v. Apfel*, 181 F.3d 358, 360

(3d Cir. 1999).  Substantial evidence is "more than a mere scintilla," and "such relevant evidence

as a reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112,

118 (3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion,

the decision of the ALJ will not be overruled as long as there is substantial evidence to support it.

*See, e.g.*, *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The Court exercises plenary

review over legal issues. *See, e.g.*, *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir.

1999).  Furthermore, the Commissioner may not offer "a post-hoc rationalization" or justification

because "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's

decision." *Schuster v. Astrue*, 879 F. Supp. 2d 461, 466 (E.D. Pa. 2012) (quoting *Keiderling v.

Astrue*, No. 07-2237, 2008 WL 2120154, at *3 (E.D. Pa. May 20, 2008)).


## V.    DISCUSSION

In his Request for Review, Plaintiff raises one claim: the ALJ's RFC is not supported by

substantial evidence because she failed to evaluate and explain her analysis of the opinion of Dr.

Yacoub.  (Pl.'s Br., ECF No. 7, at 1, 4-12).

The Commissioner modified the Social Security regulations in 2017, changing the way

ALJs evaluate medical evidence.  The prior regulations, which govern claims filed before March 27, 2017, divided medical sources into three categories:  treating, examining, and non-examining. *See* 20 C.F.R. § 404.1527.  ALJs were to weigh each medical opinion and could sometimes afford controlling weight to opinions from treating sources.  *See id.*

Under the new regulations, ALJs do not place medical sources into these categories and can no longer afford controlling weight to any opinion.  *See* 20 C.F.R. § 404.1520c(a).  Instead, ALJs now evaluate the persuasiveness of each medical opinion and each prior administrative medical finding.  *See id.*  Five factors determine persuasiveness:  (1) supportability; (2) consistency; (3) relationship with the claimant, including length, purpose, and extent of the treatment relationship, as well as frequency of examinations and whether the medical source examined the claimant firsthand; (4) specialization; and (5) other factors, like "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  20 C.F.R. § 404.1520c(c). Supportability and consistency are the most important factors.  20 C.F.R. § 404.1520c(b)(2).  The ALJ must "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [her] determination or decision."  *Id.*  The ALJ need not explain her determinations regarding the other factors, but she must discuss supportability and consistency.  *Id.*

Regarding supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  Regarding consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim,

the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."

20 C.F.R. § 404.1520c(c)(2).

The ALJ summarized and evaluated Dr. Yacoub's medical opinion as follows:

> Dr. Yacoub, the claimant's primary care physician, provided an assessment dated February 17, 2021.  He opined that the claimant can lift and carry less than ten pounds and do so only occasionally.  He can sit less than two hours and stand and walk less than two hours.  He must walk five minutes for every 30 minutes of sitting, and needs to be able to shift at will from sitting to standing.  The claimant would need to lie down at unpredictable intervals during a work shift at least hourly.  Because he "must use a leg brace," the claimant can never kneel, crawl, balance, crouch, or climb ladders but can perform other postural maneuvers occasionally.  Dr. Yacoub wrote that the claimant cannot perform manipulative activities.  He also said that claimant must elevate his leg frequently.  He would have significant fatigue, pain, or drowsiness which would significantly interfere with his ability to perform gainful employment.  ([R. 368-372]).

> This opinion is not persuasive.  The claimant does not require assistive devices or a full leg brace.  He has a knee and ankle brace and has only mild weakness (4/5) in his left leg, and only mildly antalgic gait.  ([R. 335-352)].  Moreover, some of the doctor's assessments appear somewhat biased and irreconcilable.  For example, when asked to assess upper extremity functioning, Dr. [Yacoub] imposed limits on upper extremity/manipulative functions because the claimant is unable to stand while doing them.  The claimant has no upper extremity limitations that would prevent him from using his upper extremities, nor was the doctor asked if the claimant can "stand and use his upper extremities." The doctor also asserted that the claimant could never perform certain postural movements because he must wear a full leg brace. The evidence indicates that, absent surgical recovery periods, the claimant utilizes an ankle brace and shoe insoles ([R. 377]).  The opinion is also not consistent with the lack of treatment or follow up since his last surgery in 2017.  The undersigned also notes that Dr. Coleman, the psychological consultative examiner described the claimant as having a "strong, solid build" and "athletic in appearance" ([R. 71-87]), which is not consistent with an individual with the physical limitations Dr. Yacoub described.

(R. 25-26).

Plaintiff argues that the ALJ did not adequately explain her analysis of his treating

physician's opinion in violation of the regulations requiring the ALJ to articulate her

consideration of the critical supportability and consistency factors.  (Pl.'s Br., ECF No. 7, at 1, 4-

12).  He contends that the ALJ did not provide a sufficient reason to reject the limitations

assessed by Dr. Yacoub and that her evaluation contained several inadequacies frustrating

meaningful review, including second guessing the medical opinion and failing to consider

evidence in the record that supported and was consistent with the opinion.  (*Id.* at 7-12).  The

Acting Commissioner responds that the ALJ adequately considered the opinion of Dr. Yacoub

and articulated her rationale for finding this opinion unpersuasive under the applicable

regulations.  (Def.'s Br, ECF No. 10, at 1-2, 5-14).  According to the Acting Commissioner, Dr.

Yacoub's opinion was not supported by the treating physician's limited treatment records and

was inconsistent with other evidence showing that Plaintiff retained the ability to perform a

range of sedentary work.  (*Id.* at 5-14).  She argues that the ALJ's analysis permits meaningful

judicial review and that Plaintiff is asking this Court to re-weigh the evidence, which it cannot

do.  (*Id.* at 13-14).  In his reply brief, Plaintiff asserts that the Acting Commissioner proffers

improper post hoc rationalizations from parts of the record that the ALJ did not address to bolster

the ALJ's analysis.  (Pl.'s Reply Br., ECF No. 11, at 2) (citing Def.'s Br, ECF No. 10, at 5-11).

The Court agrees with Plaintiff that the ALJ failed to satisfy her obligation to explain how she

considered the supportability and consistency of Dr. Yacoub's opinion and that the Acting

Commissioner presents post-hoc justifications that were not proffered by the ALJ and cannot be

considered by this Court.

### A.    Supportability

An ALJ must "explain" how she considered supportability.  *See, e.g.*, § 404.1520c(b)(2),

(c)(1).  With respect to "the objective medical evidence and supporting explanations presented"

by Dr. Yacoub, § 404.1520c(c)(1), the ALJ found that the treating physician's assessment of

Plaintiff's upper extremities appeared somewhat biased and irreconcilable because it was based on his inability to perform functions with his upper extremities while standing.  (R. 25; *see also* R. 370).  The ALJ observed that Plaintiff had no upper extremity limitations that would prevent him from using the upper extremities and Dr. Yacoub was never asked whether the Plaintiff could stand and use his upper extremities simultaneously.  (R. 25-26).  However, the treating physician did more than merely opine on the existence of upper extremity/manipulative limitations.  On the contrary, he opined that Plaintiff had several exertional, postural, and environmental limitations, including restrictions on lifting, carrying, standing, walking, sitting, crouching, kneeling, crawling, and balancing, related to his left lower extremity.  (R. 368-72).  I conclude that the ALJ failed to consider and explain the supportability of Dr. Yacoub's opinion concerning these other limitations.

After summarizing many of these additional limitations in her decision, the ALJ did not consider their supportability in her evaluation of the medical opinion, instead focusing exclusively on Dr. Yacoub's assessment of the limitations on upper extremity/manipulative functions.  (R. 25-26).  As the Acting Commissioner acknowledges (Def.'s Br., ECF No. 10, at 10), Dr. Yacoub's opinion provided the following description of Plaintiff's conditions and diagnoses: decreased strength, decreased range of motion, pain, gait deviations, and balance deficits; ADL dysfunction and impaired functional mobility; limited activity tolerance; and depression and anxiety due to pain.  (R. 372).  However, the ALJ did not mention this statement in her decision.  (*See* R. 18-28).  The Acting Commissioner argues that some of "these findings" were not referenced in Dr. Yacoub's treatment records and that they did not support the extreme limitations in his opinion, proffering as an example that a limping gait and decreased strength in Plaintiff's left leg did not establish that he was incapable of performing even sedentary work.  (Def.'s Br., ECF No. 10, at 10) (citing R. 372).  She also contends that, other than listing "this

description of findings," Dr. Yacoub did not point to any specific evidence in his opinion.  (*Id.* at 10-11).  The ALJ, which never mentioned Dr. Yacoub's "description of findings," did not proffer the Acting Commissioner's reasons as the grounds for discounting the treating physician's medical opinion.  Accordingly, the Acting Commissioner's arguments must be rejected as nothing more than improper post-hoc rationalizations.  *See, e.g.*, *Schuster*, 879 F. Supp. 2d at 466.

According to the Acting Commissioner, Dr. Yacoub's opinion that Plaintiff's condition would likely cause a degree of pain which would significantly interfere with his ability to perform gainful employment and require him to lie down at unpredictable intervals was not supported by the physician's treatment records because he rated the severity of his left foot pain at only a four out of ten and described the pain as moderate.  (*Id.* at 10) (citing R. 353, 369, 372).  As to the treating physician's opinion that certain postural movements could never be performed because Plaintiff needed to wear a leg brace, she contends that Dr. Yacoub never stated in his limited treatment records that Plaintiff wore a leg brace.  (*Id.*) (citing R. 353-67).  The Acting Commissioner also argues that there was no explanation supporting his opinion that Plaintiff was limited to lifting and carrying less than ten pounds, Dr. Yacoub's treatment records did not include evidence to support his assessment that Plaintiff needed to elevate his legs frequently, and, as to his assessed restrictions on standing, walking, and sitting, Dr. Yacoub found nothing more than tenderness in the left knee and tenderness and decreased range of motion in the left ankle in his December 2020 examination of Plaintiff.  (*Id.* at 9-10) (citing R. 354, 368, 370).

However, these were not the reasons cited by the ALJ for discounting the opinion of Dr. Yacoub (*See* R. 25-26).  *See, e.g.*, *Schuster*, 879 F. Supp. 2d at 466.  In fact, the ALJ did not mention Dr. Yacoub's treatment records in her evaluation of his opinion; she accordingly failed to satisfy her obligation under § 404.1520c(b)(2) to explain why Plaintiff's complaints of

moderate yet chronic left foot and upper leg pain and Dr. Yacoub's examination findings, which were generally unremarkable except for findings of left knee and ankle tenderness and decreased range of motion (R. 353-54), did or did not support the treating physician's opinion concerning Plaintiff's limitations.[2]  In her recitation of the medical evidence as part of the RFC assessment, the ALJ summarized Plaintiff's December 2020 examination by his primary care physician.  (R. 24) (citing R. 353-56).  Additionally, the Acting Commissioner contends that the ALJ adequately considered the medical opinion evidence because, in the conclusion of her overall RFC assessment, she generally referred to Plaintiff's long history of left leg deformity; the effects of his multiple surgeries; the physical examination findings consistently showing left leg deformity, range of motion limitations, muscle atrophy, and muscle weakness, which, according to ALJ, were consistent with a range of sedentary work; the fact that he should never climb or be exposed to heights and can perform postural maneuvers only occasionally to prevent exacerbation of pain; and the existence of environmental limitations for his residual surgical symptoms of tenderness and scarring together with sleep apnea.  (R. 26).  But a mere factual recitation of the physician's treatment records and general statements concerning Plaintiff's medical conditions, limitations, and physical examination findings lack the requisite analysis of whether Dr. Yacoub's treatment records support his conclusions.

Accordingly, the Court remands for the ALJ to consider the supportability of Dr. Yacoub's opinion pursuant to 20 C.F.R. § 404.1520c(b) and (c)(1).

### B.     Consistency

In addition, I conclude that the ALJ did not adequately explain how she considered the

---

[2]  The ALJ did note that that the evidence indicated that Plaintiff utilizes an ankle brace and shoe insoles as opposed to a full leg brace.  (R. 26) (citing R. 377).  But she cited to Dr. Downey's treatment records, thereby implicating the consistency prong of the analysis (*see infra* Section V.B.).

second critical factor in her evaluation of Dr. Yacoub's medical opinion, specifically, the consistency between the opinion "with the evidence from other medical sources and nonmedical sources in the claim," 8 C.F.R. § 404.1520c(c).

The Court has already considered and rejected the Acting Commissioner's argument that ALJ adequately considered the medical opinion evidence by proffering a summary of its RFC assessment.  (*See supra* Section V.A.; Def.'s Br, ECF No. 10, at 13-14).  General conclusions concerning the Plaintiff's RFC are not sufficient to satisfy the ALJ's obligation to explain how she consider the consistency of a medical opinion with the evidence from other sources in the record.

The ALJ observed that Gregory Coleman, Psy.D., the psychological consultative examiner, described Plaintiff as having a strong solid build and as being athletic in appearance, which, according to the ALJ, was not consistent with the physical limitations described by Dr. Yacoub.  (R. 26) (citing R. 71-87).  But the ALJ fails to explain how such general findings of physical well-being in a consultative psychological examination were inconsistent with the treating physician's opinion concerning specific physical limitations arising out of problems with Plaintiff's left lower extremity.  The Acting Commissioner argues that it was not erroneous for the ALJ to rely on this observation, explaining that it was inconsistent with the degree of limitation described by Dr. Yacoub, such as a restriction to lifting less than ten pounds and needing to lie down hourly depending on the level of pain.  (Def.'s Br., ECF No. 10, at 12) (citing R. 26, 368-69).  However, the ALJ did not proffer this explanation in her decision. *Schuster*, 879 F. Supp. 2d at 466 (stating that court cannot consider post-hoc rationalizations).  In any event, the ALJ also failed to satisfy her responsibility to explain how she considered the consistency of the opinion of Plaintiff's treating physician with the medical evidence presented by Plaintiff's podiatrist, Dr. Downey, and the internal medicine consultant, Dr. Monfared.

As part of her overall RFC assessment, the ALJ summarized the March 2021 examination conducted by Dr. Downey.  (R. 24).  Relying on this summary, the Acting Commissioner asserts that the ALJ did not discount the evidence from Dr. Downey and instead cited to it in her decision.  (Def.'s Br., ECF No. 10, at 12) (citing R. 24).  20 C.F.R. § 404.1520c(b)(2) requires the ALJ to explain why an opinion is consistent or not consistent; the ALJ must do more than simply recite or summarize the other evidence in the record somewhere in her decision.  The Acting Commissioner's claim that the ALJ did not discount this evidence because it was cited elsewhere in her decision is an improper post-hoc rationalization, *see, e.g.*, *Schuster*, 879 F. Supp. 2d at 466.  Except for a single citation to Dr. Downey's treatment notes as support for the finding that Plaintiff utilized an ankle brace and shoe insoles, the ALJ did not mention Dr. Downey's treatment records in her assessment of Dr. Yacoub's opinion (R. 25-26) (citing R. 377).  She accordingly did not evaluate the consistency of Dr. Yacoub's opinion with Dr. Downey's specific examination findings of loss of muscle mass in the left lower leg, decreased discrimination between sharp/dull in the left leg and foot, antalgic left limp, collapsing pes valgo deformity, decreased ankle joint dorsiflexion, and absent hindfoot and midfoot motion.  (R. 375-76, 381-82).  Furthermore, Dr. Downey diagnosed acquired hammer toe, hallux malleus, primary osteoarthritis, and pain in the left foot together with arthritis in the left ankle.  (R. 376. 382).  He also indicated that Plaintiff reported that his problems had worsened over the past two years and that he had increasing difficulty standing and walking on his left foot.  (R. 373, 379).  But the ALJ ignored this medical evidence in her assessment of Dr. Yacoub's opinion.  If the ALJ had considered the consistency of Dr. Yacoub's opinion with these records from another medical source, she may have reached a different conclusion about the opinion's persuasiveness.  Because the ALJ instead selectively highlighted the podiatrist's reference to an ankle brace and shoe insoles, her consistency analysis is flawed.  *See, e.g.*, *Piper v. Saul*, No. 2:18-1450, 2020

WL 709517, at *4 (W.D. Pa. Feb. 12, 2020) ("The ALJ is not entitled to 'cherry pick' favorable evidence and ignore records that run counter to her findings."); *Fanelli v. Colvin*, No. 3:16-CV-1060, 2017 WL 551907, at *9 (M.D. Pa. Feb. 10, 2017) ("[A]n evaluation [] where the evaluator mentions only isolated facts that militate against the finding of disability and ignores much other evidence that points another way, amounts to a 'cherry picking' of the record which this Court will not abide."); *Griffith v. Astrue*, 839 F. Supp. 2d 771, 783 (D. Del. 2012) ("Plaintiff correctly argues that an ALJ is not permitted to 'cherry pick' only that evidence that supports her position.").

The Acting Commissioner's additional contentions concerning Dr. Downey's findings constitute post-hoc rationalizations. She contends that Dr. Yacoub's opinion that Plaintiff needed to elevate his leg frequently was not consistent with the conservative treatment options recommended by Dr. Downey, who did not advise Plaintiff to elevate his leg to alleviate his left foot pain. (Def.'s Br, ECF No. 10, at 12) (citing R. 376-77, 382). She also indicates that Dr. Downey's findings, which pertained primarily to his left lower extremity, did not mean he was restricted from performing sedentary work. (*Id.*). The Acting Commissioner again is offering improper after-the-fact justifications for the ALJ's decision. *See, e.g.*, *Schuster*, 879 F. Supp. 2d at 466. In her decision, the ALJ did not proffer Dr. Downey's conservative treatment options, the fact that the podiatrist never told Plaintiff to elevate his leg, or the notion that left lower extremity problems did not preclude someone from performing sedentary work as reasons for discounting Dr. Yacoub's conclusions. In fact, the ALJ indicated that Dr. Yacoub's opinion was not consistent with the lack of treatment or follow up since his last surgery in 2017, which is at odds with the emphasis that the ALJ placed on Plaintiff's use of a knee and ankle brace and shoe insoles as opposed to a full leg brace and her references elsewhere in her decision to Dr. Downey's discussion of treatment options in 2021 and the fact that he was continuing to take

Vicodin in March 2020.  (R. 24-26).

The ALJ also did not adequately consider whether Dr. Yacoub's opinion was consistent with the examination findings made by Dr. Monfared, who conducted an internal medicine consultative examination at agency request.  The Acting Commissioner argues that, "as stated above with regard to Dr. Downey," the ALJ did not overlook Dr. Monfared's abnormal examination findings, which were primarily limited to Plaintiff's left extremity and did not prevent him from performing sedentary work.  (Def.'s Br, ECF No. 10, at 12-13) (citing R. 336-38).  As part of her evaluation of Dr. Yacoub's opinion, the ALJ did mention Dr. Monfared's statement that Plaintiff had a knee and ankle brace, mild weakness in the left leg, and mildly antalgic gait.  (R. 25) (citing R. 335-52).  However, the ALJ did not proffer as a basis for discounting Dr. Yacoub's opinion the fact that most of Dr. Monfared's findings were primarily limited to Plaintiff's left extremity.  (R.25-26).  She also did not evaluate the consistency of Dr. Yacoub's opinion with the other examination findings made by Dr. Monfared, including a length discrepancy between Plaintiff's legs; documented inability to walk on heels and toes secondary to weakness in the left leg; inability to squat as a result of lower extremity weakness; extensive scarring, significant atrophy, and loss of muscle strength with a two-centimeter discrepancy between the circumference of the right calf and the left; and noticeably limited movement of the left ankle, recued muscle strength, and diminished sensation in the left lower extremity.  (R. 336-38).  Plaintiff also reported to Dr. Monfared that he had severe pain on a daily basis rated at a five out of ten and ten out of ten when aggravated, which was not mentioned in the ALJ's evaluation.  (R. 335).  If the ALJ had not selectively highlighted only the evidence from Dr. Monfared's report tending to support her determination, she may have reached a different conclusion as to Dr. Yacoub's opinion.  *See e.g., Piper*, 2020 WL 709517, at *4 ("The ALJ is not entitled to 'cherry pick' favorable evidence and ignore records that run counter to her findings.").

Citing to the ALJ's summary of Dr. Monfared's examination as part of her general RFC evaluation, the Acting Commissioner points out that Dr. Monfared noted that Plaintiff's limp was less obvious when he was wearing the brace and that he needed no assistance with sitting in or rising from a chair or from the examination table or with changing for the examination. (Def.'s Br., ECF No. 10, at 12-13) (citing R. 23, 336-37).  However, the ALJ never indicated that she discounted Dr. Yacoub's opinion based on this evidence, which makes the Acting Commissioner's assertions no more than post-hoc rationalizations.  *See, e.g..*, *Schuster*, 879 F. Supp. 2d at 466.  Evidentiary summaries are also not sufficient to satisfy the ALJ's obligation to explain how she considered the consistency of a medical opinion with other evidence in the record.

The Acting Commissioner cites the medical opinion submitted by Dr. Monfared, arguing that, unlike Dr. Yacoub, Dr. Monfared opined that Plaintiff could lift and carry up to twenty pounds occasionally, sit up to eight hours, and had no upper extremity limitations.  (*Id.*) (citing R. 340).  But the internal medicine consultant also opined that Plaintiff must not stand more than one hour, should never balance, and could not walk longer than thirty minutes without interruption.  (R. 341, 343).  In any event, the ALJ never summarized, or even acknowledged the existence of, Dr. Monfared's medical opinion at any point in her decision.  Again, this makes the Acting Commissioner's arguments based on this medical opinion improper post-hoc justifications.  On remand, the ALJ must consider Dr. Monfared's opinion as part of her assessment of Dr. Yacoub's opinion.

Accordingly, the Court remands for the ALJ to address the consistency of Dr. Yacoub's opinion pursuant to 20 C.F.R. § 404.1520c(b) and (c)(2).

## VI.    CONCLUSION

For the reasons set forth above, Plaintiff's request for Review is **GRANTED**.  This

matter is remanded for further proceedings consistent with this memorandum.

BY THE COURT:


  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge